1997 ME 228

**STATE of Maine**

v.

**Shirley MOULTON.**

Supreme Judicial Court of Maine.

Submitted on Briefs Sept. 16, 1997.

Decided Dec. 10, 1997.

Geoffrey Rushlau, Dist. Atty., Leane Zainea, Asst. Dist. Atty., Belfast, for State.

William L. Dawson, Jr., Glass & Dawson, P.A., Belfast, for defendant.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

LIPEZ, Justice.

[¶ 1] Shirley Moulton appeals from the judgment entered in the Superior Court

(Waldo County, *Kravchuk, J.*) following her conviction for operating under the influence (Class D) in violation of 29–A M.R.S.A. § 2411 (1996 & Supp.1996).[1] On appeal Moulton contends that the District Court (Belfast, *Staples, J.*) erred in denying her motion to suppress the evidence derived from an investigatory stop, and that the Superior Court erred in admitting testimony at trial concerning the horizontal gaze nystagmus test administered by the arresting officer during the stop. We affirm the judgment.

## I.

[¶ 2] At 12:30 a.m. on September 16, 1995, while on routine patrol in a marked police cruiser in Belfast, State Trooper Thomas Ballard observed a car with its motor running and its lights on stopped in the roadway in front of the Legion Hall. Noting that the car was blocking the travel lane and was next to a "no parking" sign, Ballard pulled his cruiser alongside the car without activating the cruiser's blue lights. He looked through his passenger side window into the stopped car, where he observed Shirley Moulton in the driver's seat and a male passenger kneeling on the front seat and leaning over Moulton. She looked at Ballard with a "confused or dazed" expression.

[¶ 3] Ballard stepped out of his cruiser, approached the stopped car, and asked Moulton if her car was disabled and whether she needed help. Moulton responded that she was okay. Ballard immediately smelled a strong odor of alcohol coming from inside the car, and observed that Moulton's speech was slurred and that her eyes were glassy and red. He then asked for her license and registration and requested that she step out of the car. After repositioning his cruiser and activating its blue lights, Ballard asked Moulton to perform four field sobriety tests, including the horizontal gaze nystagmus (HGN) test,[2] each of which she performed

1. 29–A M.R.S.A. § 2411 (1996 & Supp.1996) provides in pertinent part:

    **1. Offense.** A person commits OUI, which is a Class D crime unless otherwise provided, if that person operates a motor vehicle:
      A. While under the influence of intoxicants; or

      B. While having a blood-alcohol level of 0.08% or more.

2. To administer an HGN test, an officer uses a pen to check for involuntary jerking of each of the eyes, which results in "clues" of intoxication. *See State v. Taylor,* 1997 ME 81, ¶¶ 4, 8, 694 A.2d 907, 908–09. There are three parts to the test.

poorly. On the basis of these field sobriety tests and his other observations of Moulton, Ballard arrested Moulton for operating under the influence.

[¶ 4] After entering a not guilty plea at her arraignment, Moulton filed a motion to suppress all evidence derived from the stop, arguing in part that Ballard lacked a reasonable suspicion to justify the stop. The court denied the motion, finding that no seizure had occurred until Ballard requested Moulton to produce her license and registration, at which time he did have a reasonable suspicion to justify the stop. After transferring her case to the Superior Court for a jury trial, Moulton objected at trial to the admission of testimony by Ballard concerning the HGN test, arguing that its reliability had not been established. The court overruled her objection, finding that 29-A M.R.S.A. § 2525 (1996) authorized admission of Ballard's HGN testimony, notwithstanding the absence of any showing of reliability. After establishing that he was properly certified in drug recognition pursuant to statute, Ballard testified about Moulton's poor performance on the HGN test.

[¶ 5] The court entered a judgment on a jury verdict finding Moulton guilty of operating under the influence in violation of 29-A M.R.S.A. § 2411, and this appeal followed.

## II.

[¶ 6] Moulton argues that the court erred as a matter of law in determining that she was not seized at the time Ballard pulled his cruiser alongside her car. We will not disturb the court's decision unless we find errors of law or clearly erroneous findings of fact. *See State v. Stade,* 683 A.2d 164, 165 (Me.1996). In this case, neither party disputes the court's factual findings, and we review the court's legal conclusion independently.

[¶ 7] An encounter between a police officer and a citizen implicates the Fourth Amendment only if the officer "seizes" the citizen. *See State v. Laplante,* 534 A.2d 959, 962 (Me.1987) (citing *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983)). We have held that a "seizure" of the person occurs when " 'the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen' such that he is not free to walk away." *State v. Preble,* 430 A.2d 553, 555 (Me.1981) (quoting *United States v. Viegas,* 639 F.2d 42, 44 (1st Cir.1981)); *see State v. Bleyl,* 435 A.2d 1349, 1356 (Me.1981); *see also United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (a seizure occurs when, under a totality of the circumstances, a reasonable person would believe she is not free to leave).

[¶ 8] We recognize, however, that "not all personal intercourse between policemen and citizens" is a seizure within the meaning of the Fourth Amendment. *See Terry v. Ohio,* 392 U.S. 1, 20 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Although the place where the intrusion occurs is not the controlling determinant of the seizure question, *see State v. Griffin,* 459 A.2d 1086, 1089 (Me.1983), police officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, or asking her if she is willing to answer some questions. *See Laplante,* 534 A.2d at 962. *Compare id.* (finding no seizure where officer stopped to investigate a lone car in the breakdown lane of a highway) *with State v. Chapman,* 495 A.2d 314, 316 (Me.1985) (finding seizure where officer positioned his cruiser so as to prevent any movement of the defendant's truck); *see generally* 4 W. LaFave, Search & Seizure § 9.3(a) n. 45 (1996 & Supp.1998) (collecting cases that hold there is no seizure when an officer merely walks up to a person seated in a vehicle located in a public place and puts a question to her).

[¶ 9] Applying these principles to the uncontroverted facts of this case, we con-

---

First, the officer checks for lack of smooth pursuit of the eyes by bringing the pen back and forth in front of the subject's eyes. Second, the officer checks for maximum deviation of the eyes by bringing them out to the very extremes that they can travel in the eye socket. Third, the officer brings the subject's eyes out forty-five degrees to observe at what point any involuntary jerking of the eyes begins. *See id.*

clude that the court did not err in its determination of when the seizure occurred. Upon observing a lone car with its lights on and its engine running stopped in the travel lane after midnight, Ballard placed his cruiser alongside it and approached the driver to ask if she needed assistance. He did not restrict Moulton's ability to leave by blocking her car, nor did he signal his authority over her by activating his cruiser's blue lights. Ballard's status as a police officer did not automatically transform his roadside inquiry into a "show of authority" or a "restraint of liberty" implicating constitutional protections. Under these circumstances, we agree that no seizure occurred until Ballard requested Moulton to produce her license and registration.[3]

[¶ 10] Finally, we conclude that the court did not err in finding that Ballard's investigatory detention of Moulton for suspicion of operating under the influence was justified. In order to justify an investigatory detention short of formal arrest, a law enforcement officer must act on the basis of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Griffin*, 459 A.2d at 1089 (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880). At the time Ballard asked for Moulton's license and registration, he had noted her slurred speech, red and glassy eyes, and the odor of alcohol on her breath. These observations gave Ballard a reasonable suspicion of criminal conduct justifying the detention, and the court did not err in denying Moulton's motion to suppress.

### III.

[¶ 11] Moulton next contends that the Superior Court erred in allowing Ballard to testify about the horizontal gaze nystagmus test he administered during the stop. In overruling Moulton's objection to the admission of the HGN testimony, the court relied expressly and exclusively on 29–A M.R.S.A. § 2525 (1996), and made no independent findings regarding the test's reliability. Entitled "Drug Impairment Assessment," section 2525 provides in pertinent part:

> **1. Submission to test required.** If a drug recognition technician[4] has probable cause to believe that a person is under the influence of a specific category of drug, a combination of specific categories of drugs or a combination of alcohol and one or more specific categories of drugs, that person must submit to a blood or urine test selected by the drug recognition technician to confirm that person's category of drug use and determine drug concentration.
>
> **2. Admissibility of evidence.** If a law enforcement officer certified as a drug recognition technician ... conducts a drug impairment assessment, the officer's testimony about that assessment is admissible in court as evidence of operating under the influence of intoxicants. Failure to comply with any provision of this section does not, by itself, result in the exclusion of test results, unless the evidence is determined to be not sufficiently reliable.

*Id.* Thus, section 2525(2) permits a certified drug recognition technician to testify about a "drug impairment assessment" as evidence of "operating under the influence of intoxicants."[5]

[¶ 12] In opposing Moulton's objection to the admission of the HGN testimony, the State argued that Ballard was a certified drug recognition technician; that his HGN test constituted a valid "drug impairment assessment" within the meaning of subsection (1); and that his testimony concerning

---

**3.** In reaching this conclusion, we are not suggesting that an investigatory stop based on safety concerns alone would have been unjustified in this case. We have recognized that safety reasons can be sufficient to justify an investigatory stop if they are based on specific and articulable facts. *See State v. Pinkham*, 565 A.2d 318, 319 (Me.1989). We have simply concluded that the court ruled correctly that an investigatory stop based on safety concerns did not occur in this case.

**4.** 29–A M.R.S.A. § 2526 (1996) sets forth the eligibility, training, and certification requirements for drug recognition technicians.

**5.** 29–A M.R.S.A. § 2401(13) (1996) defines "under the influence of intoxicants" as "being under the influence of alcohol, a drug other than alcohol, a combination of drugs or a combination of alcohol and drugs."

the HGN test was admissible without regard to reliability as evidence of operating under the influence of intoxicants pursuant to subsection (2). The court agreed with this interpretation of section 2525.

[¶ 13] Moulton argues, however, that subsection (1)'s mandatory testing provision is triggered only if a certified drug recognition officer has probable cause to believe that a person is under the influence of a *drug or drugs,* not alcohol alone. The statutory definition of "drugs," she argues, does not include alcohol. Based on her conclusion that alcohol alone is not a type of intoxicant contemplated by subsection (1)'s mandatory testing provision, she contends that subsection (2)'s admissibility provision is inapplicable to her case, in which there was no suspicion of drug use.

[¶ 14] In construing a statute, we first look to the plain meaning of the statutory language to give effect to legislative intent; only if the meaning of the statute is unclear will we examine other indicia of legislative intent. *See Pelletier v. Fort Kent Golf Club,* 662 A.2d 220, 223 (Me.1995). In this case, section 2525(2)'s reference to a "drug impairment assessment" is ambiguous. That term could include only the "blood and urine tests" referred to in subsection (1), or it could have a more general meaning (i.e., one that would encompass an HGN test). The reference to "drugs" is also ambiguous. 29-A M.R.S.A. § 2401(4) defines "drugs" as follows:

> "Drugs" means scheduled drugs as defined under Title 17–A, section 1101. The term "drugs" includes any natural or artificial chemical substance that, when taken into the human body, can impair the ability of the person to safely operate a motor vehicle.

The second sentence of this definition was added by amendment in 1995. *See* P.L.1995, ch. 145, § 1. Although alcohol is not a scheduled drug within the meaning of 17–A M.R.S.A. § 1101, it arguably could fall within the second sentence's definition of a "drug."

Thus, there is ambiguity as to whether alcohol is within section 2401(4)'s definition of drugs. Accordingly, we must look to other indicia of legislative intent.

[¶ 15] In 1995 the Legislature amended section 2525 to eliminate a "sunset provision" repealing the statute in June 1995. *See* P.L. 1995, ch. 145, § 2. The preamble of the amendment's L.D. states in pertinent part: "Whereas, the drug recognition technician program results in the prosecution of persons who operate motor vehicles while under the influence of *drugs other than alcohol;* and whereas failure to prosecute this type of offender may result in a greater number of operating-under-the-influence motor vehicle accidents; ... [the sunset provision is hereby repealed]." L.D. 913 (117th Legis.1995) (emphasis added). The L.D.'s Statement of Fact contains similar language: "Drug recognition technicians are law enforcement officers specifically trained to *assess whether a person was under the influence of a drug other than alcohol ....*" *Id.* (emphasis added). This legislative history provides strong support for Moulton's position that section 2525's reference to "drugs" does not encompass alcohol.

[¶ 16] Principles of statutory construction also support this conclusion. Section 2525 uses the conjunctive "and" to describe the mandatory testing provision's applicability to alcohol: "[A] specific category of drug, a combination of specific categories of drugs, or *a combination of alcohol and one or more specific categories of drugs ....*" This language cannot be dismissed as mere surplusage. *See Struck v. Hackett,* 668 A.2d 411, 417 (Me.1995) (nothing in statute may be treated as surplusage if a reasonable construction supplying meaning and force is otherwise possible). If alcohol were encompassed in the word drugs, it would be unnecessary and redundant to include the word "alcohol" in section 2525. Indeed, the Legislature's express inclusion of the words "alcohol" *and* "specific categories of drugs" indicates that the Legislature intended those words to mean *different* things.[6] According-

---

6. We also note section 2525's reference to "specific categories" of drugs. Again, such language cannot be overlooked as mere surplusage. *See* *Struck,* 668 A.2d at 417. A logical inference from the Legislature's use of the words "specific categories of drugs" is that the Legislature in-

ly, we conclude that the Superior Court erred in predicating its admission of Ballard's HGN testimony about alcohol use on 29–A M.R.S.A. § 2525(2).

[¶ 17] Notwithstanding the court's mistaken rationale, however, the HGN testimony was properly admitted. Although the court made no independent finding of the reliability of the HGN test, we held recently that we would take judicial notice of the reliability of such tests in making determinations of probable cause to arrest and for purposes of establishing guilt in operating under the influence cases.[7] *State v. Taylor,* 1997 ME 81, ¶ 10, 694 A.2d 907, 910. We may take judicial notice on appeal. *See id;* *see also* M.R. Evid. 201(f).[8]

[¶ 18] We stated in *Taylor* that "the results of the HGN test should be admissible if a proper foundation is laid for their introduction in evidence. A proper foundation shall consist of evidence that the officer or administrator of the HGN test is trained in the procedure and the test was properly administered." *Taylor,* 1997 ME 81, ¶ 12, 694 A.2d at 911–12. In this case, Ballard testified to these foundational requisites. Accordingly, we take judicial notice of the test's reliability. *See id.* The court did not err in admitting Ballard's HGN testimony.

The entry is:

Judgment affirmed.

---

tended to mean *statutorily categorized* drugs (that is, scheduled drugs pursuant to 17–A M.R.S.A. § 1101).

7. We recognize that the court did not have the benefit of our decision in *Taylor,* which was decided after the court's ruling in this case.

8. Maine Rule of Evidence 201(f) provides: "Judicial notice may be taken at any stage of the proceedings."