2005 ME 26

**STATE of Maine**

v.

**Joshua PATTERSON.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Dec. 8, 2004.

Decided: Feb. 9, 2005.

---

R. Christopher Almy, District Attorney, C. Daniel Wood, Asst. Dist. Attorney, Bangor, for State.

Seth D. Harrow, The Silver Law Firm, P.A., Bangor, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, and CALKINS, JJ.

DANA, J.

[¶ 1] The State of Maine appeals from a judgment entered in the District Court (Bangor, *Russell, J.*) granting Joshua Patterson's motion to suppress evidence obtained after a University of Maine police officer approached his parked vehicle. The State argues that Patterson was not seized within the meaning of the Fourth Amendment, and that the evidence should have been admitted in the State's prosecution of Patterson for OUI (Class D), pursuant to 29–A M.R.S.A. § 2411(1) (1996),[1] and operating after suspension (Class E), pursuant to 29–A M.R.S.A. § 2412–A(1), (3) (1996).[2] Because the record supports the court's determination that the officer seized Patterson by ordering him to roll down his window, we affirm.

---

1. Title 29 M.R.S.A. § 2411(1) was repealed and replaced by P.L. 2003, ch. 452 §§ Q–77 to Q–83 (effective July 1, 2004), *codified at* 29–A M.R.S.A. § 2411(1–A) (Supp.2004).

2. Title 29–A M.R.S.A. § 2412–A(1) was repealed and replaced by P.L. 2003, ch. 452 §§ Q–84 to Q–85 (effective July 1, 2004), *codified at* 29–A M.R.S.A. § 2412–A(1–A) (Supp. 2004). Title 29–A M.R.S.A. § 2412–A(3) was amended by P.L. 2003, ch. 673 § TT–5 (effective July 30, 2004), *codified at* 29–A M.R.S.A. § 2412–A(3) (Supp.2004).

## I. BACKGROUND

[¶ 2] The facts of this case are not disputed. Shortly after midnight on January 31, 2004, a University of Maine campus police officer observed Patterson's automobile, a red Saab, driving on the south end of the campus. The officer observed the driver engage his turn signal and slow down as the Saab approached an intersection. Before the turn, however, the driver disengaged the turn signal and continued down the road. The police officer began to follow the Saab, but she did not engage the cruiser's emergency lights.

[¶ 3] The cruiser followed Patterson's vehicle until it turned into a frequently used parking lot and pulled into a marked, legal parking space. The officer did not observe any traffic violations or other illegal conduct. She later testified that she was suspicious of the vehicle because of the initial, aborted turn and its "slightly erratic" acceleration and deceleration.

[¶ 4] After Patterson's car pulled into the parking space, the patrol officer used her police radio and requested that another officer in an unmarked vehicle take over surveillance. Sgt. Robert Norman responded to the request. Upon arriving in the parking lot, Sgt. Norman noticed that the Saab's engine was still running. He saw the car's rear window begin to fog up, and noticed what appeared to be cigarette smoke coming from the passenger side.

[¶ 5] After observing the car for five minutes, Sgt. Norman pulled his unmarked car around the row of vehicles and parked it in a spot out of view of those inside the Saab. Sgt. Norman, who was wearing his uniform, got out of his car and approached Patterson's car. He later testified that he was suspicious because the occupants had remained in the car on a cold night, rather than exiting the vehicle and proceeding indoors. He suspected that the occupants might be using drugs or drinking alcohol inside the car.

[¶ 6] As Sgt. Norman approached the driver's side of the Saab, he saw that the door was shut and the windows were closed. There were other vehicles parked in front of and beside Patterson's, but Sgt. Norman testified that he did not block Patterson's vehicle from backing out. Sgt. Norman looked through the car's side window and saw two people inside the vehicle. He observed nothing illegal. He tapped on the window, and said, in a voice loud enough to be heard over the engine, "please roll down the window."

[¶ 7] After Sgt. Norman tapped on the window, Patterson responded by opening the driver's side door. At that time, Sgt. Norman testified that he smelled cigarette smoke and alcohol, and he ordered Patterson out of the vehicle. Patterson was later charged with OUI (Class D), pursuant to 29–A M.R.S.A. § 2411(1), and operating after suspension (Class E), pursuant to 29–A M.R.S.A. § 2412–(A)(1), (3). Patterson entered a plea of not guilty, and filed a motion to suppress all evidence obtained after Sgt. Norman told Patterson to roll down the window. At the hearing on the motion, the trial court heard testimony from the two police officers who saw Patterson's vehicle that night.

[¶ 8] After the hearing, the court granted the motion to suppress on the grounds that Patterson was seized in the absence of any articulable suspicion for the seizure and therefore in violation of the Fourth Amendment. The State subsequently moved the court to enter findings of fact pursuant to M.R.Crim. P. 41A(d). The court granted the motion. In its written findings of fact, the court cited three factors that weighed in favor of its conclusion that a seizure took place: (1) Sgt. Norman was in uniform; (2) Patterson had an expectation of privacy inside his car; and (3)

Sgt. Norman rapped on the driver's side window and requested that the window be rolled down. The court concluded that "more probably than not, the defendant perceived the Sergeant's acts and words as a command from a police officer and not as a request for a conversation."

## II. DISCUSSION

■ [¶ 9] The State appeals the suppression ruling, arguing that because no detention or stop occurred, Sgt. Norman's conduct did not violate Patterson's Fourth Amendment rights. The State does not argue that the police had the requisite articulable suspicion to detain Patterson at the time Sgt. Norman approached the vehicle.[3] Therefore, the only issue we must decide is whether Sgt. Norman's actions constituted a seizure for purposes of the Fourth Amendment.

■ [¶ 10] The Fourth Amendment to the U.S. Constitution, and Article 1, Section 5 of the Maine Constitution, offer identical protection against unreasonable searches and seizures. *State v. Gulick*, 2000 ME 170, ¶ 9 n. 3, 759 A.2d 1085, 1087. "An encounter between a police officer and a citizen implicates the Fourth Amendment only if the officer 'seizes' the citizen." *State v. Cilley*, 1998 ME 34, ¶ 7, 707 A.2d 79, 82. A seizure occurs when an officer, by a show of authority, in some way restrains a citizen such that "he is not free to walk away." *Id.* (quotation marks omitted). The test for whether a seizure has occurred is an objective one, i.e., whether a reasonable person would have believed that he was not free to leave. *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

■ [¶ 11] The State does not dispute the factual findings entered below, but contends that the trial court erred as a matter of law in determining that Patterson was seized when Sgt. Norman tapped on his window and spoke to Patterson. We review independently whether a court's historical findings of fact constitute a seizure for Fourth Amendment purposes. *State v. Brewer*, 1999 ME 58, ¶ 10, 727 A.2d 352, 355.

[¶ 12] In *Brewer*, we determined that two police officers did not "seize" a motorist when they held out their badges and approached a parked vehicle. *Id.* ¶ 13, 727 A.2d at 355. We noted that "the agents did not display any weapons, position their vehicle to prevent Brewer from leaving, *give oral instructions to Brewer or Noyes,* or activate the police lights." *Id.* ¶ 13, 727 A.2d at 356 (emphasis added). We also noted that a seizure may occur by "the use of language or tone of voice that would indicate that compliance with the officer's request might be compelled." *Id.* ¶ 12, 727 A.2d at 355 (quoting *Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

[¶ 13] Unlike the agents in *Brewer*, the police officer in this case made verbal contact with Patterson, telling him to roll down his window. Whether this communication was sufficient to effect a seizure depends upon whether it was a polite request, or a command:

[T]he mere approach and questioning of such persons does not constitute a sei-

---

3. The police may make brief, investigatory stops of people on the basis of " 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *State v. Moulton*, 1997 ME 228, ¶ 10, 704 A.2d 361, 364 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Although the State raised the reasonable suspicion standard at the motion hearing, its brief to this Court does not argue that this encounter qualifies as a *Terry* stop. Issues not briefed to this Court are not preserved. *Holland v. Sebunya*, 2000 ME 160, ¶ 9 n. 6, 759 A.2d 205, 209.

zure. The result is not otherwise when the officer utilizes some generally accepted means of gaining the attention of the vehicle occupant or encouraging him to eliminate any barrier to conversation. The officer may tap on the widow and perhaps even open the door if the occupant is asleep. *A request that the suspect open the door or roll down the window would seem equally permissible, but the same would not be true of an order that he do so.*

WAYNE R. LAFAVE, 4 SEARCH AND SEIZURE § 9.4(a) at 433 (2004) (emphasis added).

[¶ 14] The record reveals that the trial court was attuned to the significance of Sgt. Norman's statement to Patterson. At the hearing, immediately after listening to Sgt. Norman's testimony, the court identified the issue as whether Patterson "heard a request, which is . . . no problem or an order which raises questions of a seizure." The court concluded that based on the officer's conduct, a seizure occurred. The subsequent written findings of fact reiterate the court's belief that Sgt. Norman's statement constituted an order.[4] Because a reasonable person would not feel free to disobey an order from a police officer, Sgt. Norman's command constituted a seizure, and the evidence obtained thereafter was properly suppressed.

[¶ 15] The State argues that our opinion in *Gulick* requires a different outcome. *Gulick* involved a driver who pulled into the parking lot of a closed medical care facility late at night. *Gulick*, 2000 ME 170, ¶ 17, 759 A.2d at 1089. The officer approached the vehicle and asked if the driver was okay. *Id.* ¶ 4, 759 A.2d at 1086. In this case, Sgt. Norman observed a vehicle parked among other cars in a well-used university parking lot. He did not have any concerns about the safety of the driver; rather, he was concerned that students might be drinking or smoking marijuana in the vehicle. Upon approaching the car, he did not smell any marijuana and saw no signs of illegal activity. Without any evidence that Patterson was in distress or acting illegally, Sgt. Norman instructed Patterson to roll down the window. The record supports the court's conclusion that a reasonable person in Patterson's position would not "feel free to decline the officers' requests or otherwise terminate the encounter." *United States v. Drayton*, 536 U.S. 194, 202, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (quotation marks omitted).

[¶ 16] This is an admittedly close case,[5] turning on the precise nature of Sgt. Norman's statement, and how a reasonable person would interpret that statement.

---

4. The State points to the court's written findings of fact, in which the court wrote that Sgt. Norman "rapped on the driver's side window and requested that the window be rolled down." According to the State, this constitutes a finding that Sgt. Norman's communication was a request, not an order. The court's very next sentence, and its comments at the hearing, make it clear that the court determined that the "request" was, in fact, an order that Patterson reasonably believed he could not ignore.

5. Other courts confronting similar facts have come to differing conclusions. *See Borowicz v. North Dakota Dep't of Transp.*, 529 N.W.2d 186, 188 (N.D.1995) (stating that stop argu-

ably occurred when officer's instruction to open the door could be interpreted as an order); *Ebarb v. State*, 598 S.W.2d 842, 850 (Tex.Crim.App.1979) (holding that officer's order to roll down window or open door creates a temporary seizure); *but see Akins v. State*, 266 Ga.App. 214, 596 S.E.2d 719, 722 (2004) (holding that police may approach citizen and ask that he roll down the window, "as long as the officers do not detain the citizen or create the impression that the citizen may not leave"); *Medley v. State*, 630 So.2d 163, 165 (Ala.Crim.App.1993) (holding that officer did not seize motorist when he tapped on window and asked driver to roll it down).

The trial court heard the testimony of Sgt. Norman. As an appellate court, we decline to review a cold transcript and draw our own factual inferences about the tone of voice, volume, and circumstances of Sgt. Norman's statement. *See Lewisohn v. State*, 433 A.2d 351, 354 (Me.1981). Because the trial court reasonably could have found that Sgt. Norman's comment constituted an order, we affirm the suppression order.

The entry is:

Judgment affirmed.