

STATE OF MAINE
PENOBSCOT, ss.

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-04-770

STATE OF MAINE

v.

RICHARD SEAMANS, JR.,

Defendant


FILED & ENTERED
SUPERIOR COURT
AUG 0 2 2005
PENOBSCOT COUNTY

ORDER

Before the court is defendant's motion to suppress all the evidence obtained by the State as a result of an interaction between Penobscot Deputy Jared Austin and defendant on June 27, 2004.

Defendant contends that Deputy Austin conducted an unlawful search of Seamans's residence on that date and obtained statements from Seamans that were both in violation of Miranda and involuntary. He also contends that certain observations that were made by Deputy Sean McCue of the contents of a white van later on June 27, 2004 should be suppressed under the Fourth Amendment.

After a hearing held on January 6, 2005, the court finds the following facts:

Initial Information

On Sunday, June 27, 2004 shortly after 7 am, Penobscot County Deputy Jared Austin received a call from his dispatcher stating that a citizen named Eugene Shorey had reported (1) that he had observed a vehicle go off the road in Corinna, (2) that the driver, Richard Seamans, was intoxicated, and (3) that after the accident Shorey had driven Seamans back to Seamans's residence. Austin was in the Bangor area and

proceeded immediately to Corinna, where he met Shorey at the accident scene. Austin spoke with Shorey by cell phone while on his way to Corinna and again at the accident scene, and Shorey both times stated that his vehicle had been following a white van with dealer plates, which he said had come from a business called "Route 7 Auto." Shorey had seen the van drifting all over the roadway and had then seen it leave the roadway, become airborne, and come to rest in a field.

Shorey stated he had stopped and had observed Richard Seamans, with whom he was acquainted, walk toward him from the direction of the van. Seamans was visibly intoxicated and told Shorey he was "shit faced." Seamans then asked Shorey for a ride home, telling Shorey this would be Seamans's fourth OUI. Shorey then dropped Seamans off at his home.

At the accident site Deputy Austin observed a level stretch of two-lane roadway along Route 7 with dry pavement. In a field along side the road there was a white van and what Austin described as a debris field, mostly pieces of plastic that appeared to have come from the underside of the van. Austin inspected the van and opened the front door to make sure there was no one injured inside. When he did, he smelled the odor of intoxicants and observed a bottle of an alcoholic beverage called "Aftershock" on the floor on the driver's side.

Interaction at Defendant's Residence

Austin then asked Shorey to direct him to the residence of Seamans. Austin followed Shorey to the mobile home park where Seamans lived, and Shorey pointed out the mobile home where Seamans resided. Shorey then departed because he was concerned about being present for a confrontation with Seamans. Approximately 35 minutes had elapsed since Austin first received the call from his dispatcher, and less than an hour had elapsed since Shorey had observed the white van leave the road.

2

Austin walked up to the residence, and as he approached the door, noticed that a male (later identified as Seamans) was observing him through a window. Austin banged on the door and yelled out for Seamans to come to the door. Seamans then opened the door and Austin observed that he was visibly intoxicated, eyes red, speech slurred, and swaying. At one point Seamans appeared to lose his balance and grabbed onto the doorframe. Deputy Austin was standing on the landing outside of the door with one foot on the doorsill when he spoke to Seamans. Seamans was originally calm but became belligerent when Austin explained why he was there, and Seamans then told Austin he had been at his residence all night.

Seamans then tried to slam the door on Austin but because Austin's foot was in the door, the door did not close. Seamans walked back into the house and sat down on the couch. Austin followed. At that point he believed he had probable case to arrest Seamans for OUI and wanted to administer an alcohol test to Seamans as soon as possible. He believed it would take several hours to obtain a search warrant and he was concerned that there would be a change in Seamans's blood alcohol content in the interim. Austin testified that at that point Seamans was not free to go. He asked Seamans several questions while Seamans was seated on the couch and Seamans responded that he was not going to tell Austin anything.

Suddenly Seamans got up and bolted for the back of the mobile home. Austin followed, concerned either that Seamans was going to flee or that he was going to grab a weapon. Austin had observed a number of hunting weapons in the residence. Seamans entered a bedroom at the back of the residence and unsuccessfully tried to shut the bedroom door on the officer. Austin then entered the bedroom and found that Seamans was calling 911. When the call was connected, Seamans handed the phone to the officer, who explained the situation to the dispatcher and asked for backup.

At this point Austin began trying to de-escalate the situation to avoid any confrontation with Seamans. He acknowledged that such de-escalation also is designed to put suspects more at ease and more likely to answer questions. When Seamans said he had to go to the bathroom, Austin, after checking the bathroom for weapons, allowed Seamans to use the bathroom with the door open.

Austin told Seamans he would be transported to the Penobscot County Jail, and Seamans picked up a pair of shoes. He immediately put them down, stating that they were wet, and put on another pair. Austin collected the wet pair of shoes for comparison with footprints at the accident site.

### Interactions in Transit and at the Penobscot County Jail

On the drive to the jail Seamans had calmed down. Austin and Seamans engaged in some conversation about hunting. Seamans then made a statement to the following effect, "You're the nicest cop I've met. Nothing personal, but I need my license for work." Although the State argues that this statement was volunteered, the court finds that Seamans made the statement by way of explaining why he had belligerently declined to answer Austin's questions in the residence. No Miranda warnings had been given at the residence, nor were such warnings given at any subsequent time in the interaction between Austin and Seamans.

At the jail Austin asked Seamans if he would submit to a breath test, and the latter replied, "I'm not going to take any of your tests." The officer went through the implied consent form with Seamans and explained the consequences of refusal. Some discussion ensued, and Seamans asked to telephone his father – which Austin allowed – but after speaking with his father, Seamans adhered to his refusal to take the test.

Austin and Seamans had some further discussion on the subject on whether an accident report was required under 29-A M.R.S.A. §2251. Told by Austin that accident

4

reports were required for incidents involving property damage of $1,000 or more, Seamans stated, "When I got out, I didn't see more than $500." Asked by Austin if he had looked underneath the vehicle, he said that he had. In the booking room at some point the officer also asked if Seamans needed medical attention. He said he had a sore neck but it did not need treatment.

## Observations of Deputy McCue

In the meantime, Deputy Sean McCue had been dispatched to examine the van but when he got to the accident scene, the van was gone. When he reported this by phone to Austin and Austin asked Seamans where the van had gone, Seamans grinned and said, "I don't know what you're talking about." He later stated, however, that he had called his father and asked him to pick up the van and take it back to Route 7 Auto Sales — something that the police learned independently from Seamans's father when the latter came to the jail to bail Seamans out.

Deputy McCue testified that he had been called out early on June 27, 2004, went to the accident scene and saw signs of the accident but no van. At a subsequent time that day, McCue was told to look for the van at Route 7 Auto, and he proceeded to that location. Route 7 Auto consists of a parking lot and a garage located in the area of the lot away from the road. In the parking lot, McCue found a white van. There were three rows of vehicles parked in the lot, and the white van was parked in the third row at the back of the lot. McCue walked onto the lot and inspected the van. There was some grass hanging from a bumper and apparent damage to a parking light, to the front grille, to the muffler and to the left rear door. The van was locked but McCue looked inside the driver's side and passenger's side windows and saw some muddy handprints and a bottle of Aftershock liquor on the driver's side floor.

5

<u>Discussion</u>

The court recognizes that this case lies at the intersection of various lines of legal precedent relating to warrantless arrests on a defendant's premises, warrantless arrests of suspects on the thresholds of their residences, and exigent circumstances. <u>See</u> <u>Welsh v. Wisconsin</u>, 466 U.S. 740 (1984); <u>Illinois v. McArthur</u>, 531 U.S. 326 (2001); <u>Payton v. New York</u>, 445 U.S. 573 (1980); 3 LaFave, <u>Search & Seizure</u> §§ 6.1(a), 6.1(e), 6.1(f) (2004).

In <u>Welsh v. Wisconsin</u>, the U.S. Supreme Court concluded that where Wisconsin treated a first offense OUI as purely a civil violation, the warrantless arrest of a defendant in his home in order to obtain a blood alcohol test violated the Fourth Amendment. 466 U.S. at 754. In particular, the court stated, where exigent circumstances were claimed, "an important factor to be considered in determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." Id. at 753. The decision left open the issue of whether exigent circumstances would have been found if there had been probable cause to conclude that the defendant had committed a criminal as opposed to a civil offense or whether warrantless arrests in a defendant's residence would only be permitted if there were both exigent circumstances and probable cause to believe the defendant had committed a serious criminal offense such as a felony.

In <u>Illinois v. McArthur</u>, 531 U.S. 326 (2001), although not presented with a warrantless arrest,[1] the U.S. Supreme Court suggested that the crucial distinction in <u>Welsh</u> was between "non-jailable" and "jailable" offenses. 531 U.S. at 336. Given

---

[1] <u>McArthur</u> involved whether law enforcement officers could prevent a suspect from reentering his own home for two hours while they obtained a search warrant. The officers had probable cause to believe that the suspect had hidden marijuana in his residence, and there was reason to believe he would destroy the evidence if allowed to reenter. The offenses in question were misdemeanors.

McArthur, the court is of the view that the Maine Law Court, if presented with this issue, would join those states which have permitted warrantless arrests for jailable OUI offenses inside a defendant's residence where the law enforcement officers had probable cause to believe the defendant had operated under the influence and where exigent circumstances also existed in that there was a need to promptly obtain evidence of the defendant's blood alcohol content. See, e.g., State v. Lovig, 675 N.W.2d 557, 565-66 (Iowa 2004); State v. Paul, 548 N.W.2d 260, 266-68 (Minn. 1996); City of Orem v. Henrie, 868 P. 2d 1384, 1392 (Utah 1994).[2] This is particularly true because the Law Court has emphasized the magnitude of the State's interest in addressing the problem of intoxicated drivers. See State v. Chase, 2001 ME 168 ¶12, 785 A.2d 702, 706; State v. Roche, 681 A.2d 472, 475 (Me. 1996).

Turning from the law to the facts of this case, the court concludes that at the time Deputy Austin went to the door of Seamans's residence, he had probable cause to arrest Seamans for operating under the influence based on what had been reported to Austin by Shorey. Moreover, because of the need to obtain contemporary evidence as to Seamans's blood alcohol level before any alcohol in his blood dissipated over time[3], exigent circumstances also existed at the time Austin ordered Seamans to open the door. See Schmerber v. California, 384 U.S. 757, 770-71 (1966). The combination of probable cause and exigent circumstances permitted Austin to enter the residence in order to arrest Seamans.

---

[2]  Professor LaFave appears to agree with this approach, although he notes that there are a number of jurisdictions that have reached a different result. 3 LaFave Search & Seizure § 6.1(f) at 316 n. 211. At the time of the contrary decisions he cites, however, the U.S. Supreme Court had not yet decided Illinois v. McArthur.

[3]  There was also the possibility that Seamans, if left at his residence, might ingest more alcohol, thus clouding the issue of his blood alcohol level at the time of operation.

Indeed, at the time that Austin went to the door of Seamans's residence, he not only had probable cause to believe that Seamans had committed a misdemeanor OUI but also had probable cause to believe that Seamans had committed a felony OUI, based on Seamans's statement to Shorey that this was his fourth OUI.[4]

Whether Austin's command to Seamans to open the door is treated as a seizure, see State v. Patterson, 2005 ME 26 ¶¶ 10-14, 868 A.2d 188, 191-192, or as a search, Austin had both probable cause and exigent circumstances. Austin's observations of Seamans at the door are not subject to suppression. Moreover, while Austin ordinarily would not thereafter have been entitled to pursue Seamans into his residence in order to effect a warrantless arrest, Austin's arrest of Seamans was valid in this case because the State has met its burden of establishing the existence of both probable cause and exigent circumstances. See Welsh, 466 U.S. at 741 (citing Payton v. New York, 445 U.S. 573 (1980), for the proposition that, absent probable cause and exigent circumstances, warrantless arrests in the home are prohibited by the Fourth Amendment). It follows that Seamans's subsequent refusal of a breath test is also admissible.

Two other issues remain: the first is the status of statements made by Seamans after the point when Austin pursued Seamans into his residence. The State has the burden of proof by a preponderance of the evidence on Miranda warning issues. The court initially concludes that the State has proven that Seamans was not in custody

---

[4]  This is true even though Seamans was not ultimately charged with a Class C OUI in this case. In this connection, the court is aware that the District Attorney's office for Penobscot County has a practice of not listing prior OUI offenses in its misdemeanor complaints, although it does bring any prior OUI offenses to the attention of the judge at the time of any sentencing. The court is not aware what practice the District Attorney's office follows with respect to Class C OUI offenses. In any event, however, the dispositive issue is not what Seamans was eventually charged with but what Austin had probable cause to believe at the time. See Welsh v. Wisconsin, 466 U.S. at 746 n.6.

during the conversation that occurred at the door. Even if Seamans had been "seized" at that time, by virtue of Austin's order that he should come to the door, see State v. Patterson, 2005 ME 26 10-14, 868 A.2d at 191-92, a reasonable person in Seamans's position would not have concluded he was in police custody and constrained "to a degree associated with formal arrest." State v. Michaud, 1998 ME 251 ¶ 4, 724 A.2d 1222, 1226. Once Austin pursued Seamans into his residence, however, Seamans was in custody for purposes of Miranda and remained so thereafter.

Based on its earlier findings, the court concludes that the State has failed to meet its burden of showing that Seamans's subsequent statement during the ride to jail ("nothing personal, but I need my license to work") was volunteered. That statement appears at least as likely to have been a delayed explanation for Seamans's failure to respond to Austin's earlier questions in the residence. Similarly, Seamans's estimate that there was only $500 in damage to the van was elicited by police questioning while he was in custody and no Miranda warning had been given.

At the same time, the State has proven beyond a reasonable doubt that the "nothing personal" statement and all of the other statements made by Seamans were voluntary. The court concludes that all the statements made by Seamans resulted from his free choice, that they were the product of a rational mind, that they were not elicited by coercive police conduct and that, under all the circumstances, the admission of the statements at trial would be fundamentally fair. See State v. Coombs, 1998 ME 1 ¶ 10, 704 A.2d 387, 390-91, cert. denied, 523 U.S. 1129 (1998).

The final issue involves Deputy McCue's observations of the van at Route 7 Auto Sales. So long as Deputy McCue was in a place where he was lawfully entitled to be, he was entitled to peer into the interior of the van. See State v. Harriman, 467 A.2d 745, 748 (Me. 1983), quoting Texas v. Brown, 460 U.S. 730, 740 (1983) (plurality). The