STATE OF MAINE                          SUPERIOR COURT
KENNEBEC, ss                            CRIMINAL ACTION
                                        DOCKET NO. CR-11-835
                                        *NM -KEN- 9/24/2012*

STATE OF MAINE

v.                                      ORDER ON MOTION
                                        TO SUPPRESS
JUSTIN TURNER,

          Defendant


          The defendant seeks to suppress evidence obtained as a result of the stop of the

vehicle operated by the defendant on 7/25/11. The defendant argues the following: (1)

the roadblock was illegal; (2) the officer lacked sufficient reasonable and articulable

facts to justify the stop; (3) the officer lacked reasonable and articulable facts to request

field sobriety test; (4) the officer lacked probable cause to arrest; (5) the officer violated

the defendant's Miranda rights; and (6) the defendant's statements were involuntary.

For the following reasons, the motion is granted in part and denied in part.

FINDINGS OF FACT

          Maine State Police Sergeant Shawn Currie graduated form the Maine Criminal

Justice Academy in 1994. On 7/25/11, he participated in a road safety check in

conjunction with a course at the Maine Criminal Justice Academy for recruits. The

roadblock was designed to increase safety. Training the recruits was also accomplished.

All troopers and recruits were in uniform, were wearing badges and reflective vests,

and were carrying firearms. Blue lights on cruisers were activated.

          Sgt. Currie was the senior sergeant involved in the safety check and determined

the safety aspects of the check. He spoke with three troop commanders about the safety

check and cleared the exercise with the Waterville Police Department prior to 7/25/11.

1

The safety check was performed on College Avenue, a two-lane divided highway with a median in Waterville. The check was set up at 9:00 p.m. and ended at midnight.

The location for the safety check was chosen because it was close to the Academy, the traffic volume was steady but not overwhelming, the area was well lit, and the location was in town but not an area with many businesses. The road at the location was a straight stretch; 200-300 yards of the road could be seen. The median provided a level of safety, especially for the traffic traveling the other way.

Written safety standard operating procedures are not required for a safety check, as they are for an OUI check. (Cf. Def.'s Ex. 1.) The OUI safety standards are used, however, for a safety check. There is no approved site list for safety checks but considerable thought was devoted to choosing this site. No advance notice to the public is required for a safety check and no literature was given to the operators of the vehicles. Although no record was kept of the number of vehicles stopped, the number of violations was recorded.

As vehicles approached the overpass on College Avenue, the road narrowed to one lane. The drivers were given advance warning by flashing blue lights. Fifteen or sixteen troopers in marked and unmarked cruisers screened each vehicle; the screening required an average of thirty seconds. The officers looked at each vehicle to determine whether there was a violation of Maine law, including defective tires, lights, expired registration, and use of seatbelts. If the officers observed no defects, the vehicle was waved through and the officers did not speak to the drivers.

Every vehicle with any defect was stopped. The decision to stop was based on the condition of the vehicle and not on the operation of the vehicle. The driver of a stopped vehicle was asked for his license, registration, and proof of insurance. The

safety check was extremely effective in detecting vehicle safety problems that could not be observed while an officer was traveling at 50 m.p.h.

Trooper Bernard Campbell graduated from the Maine Criminal Justice Academy in 2000. He participated in the safety check on 7/25 in Waterville. At approximately 11:30 p.m., he was standing on College Avenue and from the left corner of the driver's side, screened the front of the vehicle operated by the defendant. Trooper Campbell noticed that the front passenger in a vehicle was bleeding pretty heavily from the head area and there was blood on the passenger's face and shirt. The vehicle was stopped and Trooper Campbell asked the defendant what had happened. The defendant said nothing. Trooper Campbell then asked the defendant to pull over to a different area so a trooper could speak to the defendant and passenger to determine whether first aid was needed. Trooper Campbell did not ask for the defendant's license or registration.

Trooper Gregory Roy graduated from the Maine Criminal Justice Academy in 2009. During the 7/25 safety check, Trooper Roy was working in the secondary inspection area. Several troopers were in the area.

Trooper Campbell stated that they needed to address a passenger covered in blood. Trooper Campbell waived this vehicle into the secondary inspection area to the side of the road. The driver's side window was open. Trooper Roy tried to determine whether the passenger needed medical attention but both occupants refused to say anything about the injuries. When Trooper Roy asked the defendant what happened to the passenger, the defendant replied, "ask him." The passenger was the defendant's father.

Trooper Roy detected the odor of an intoxicating beverage from the defendant's breath as he spoke to Trooper Roy. Trooper Roy activated the recording device in his cruiser. Trooper Roy asked the defendant to exit the vehicle. Trooper Roy noticed a

Bud Lite can between the defendant's feet on the floorboard, which Trooper Roy removed and placed on the roof. Trooper Roy also saw a six-pack of Budweiser in the back seat; two bottles were missing. Trooper Roy asked the defendant if he had weapons and if he would mind if he was patted down for his safety and the safety of Trooper Roy. The defendant consented to the pat down.

Trooper Roy spoke to the defendant while others attended to the passenger. An ambulance ultimately arrived for the passenger, who requested to go to the hospital. Trooper Roy asked the defendant about the alcohol. The defendant denied the presence of an alcohol container in the vehicle, even after Trooper Roy showed the container to the defendant.

The defendant refused to answer questions but admitted he had consumed six beers. His speech was very loud and slurred. Trooper Roy continued to smell the odor of an intoxicating beverage coming from the defendant after the defendant exited his vehicle.

Trooper Roy performed the HGN test, for which he is trained and which he administered pursuant to his training. The defendant refused to remove his cap so he could see the stimulus; Trooper Roy removed the cap and placed it on the vehicle but the cap fell to the ground. Trooper Roy performed three controls and after passes on each eye, observed four clues: lack of smooth pursuit in both eyes and distinct and sustained nystagmus at maximum deviation in both eyes.

Trooper Roy attempted to administer the walk and turn and the one-leg stand tests. The defendant refused and demanded to speak to Trooper Roy's supervisor. The defendant did not want to speak to Sgt. Currie. Trooper Michael Johnston administered the walk and turn test and observed two clues. This test cannot be seen on the videotape. (State's Ex. 1.)

4

Trooper Roy concluded the defendant had operated a motor vehicle while under the influence. The defendant was arrested. No Miranda warnings were read. Trooper Roy transported the defendant to the Kennebec County Correctional Facility in Augusta. After his arrest and during the drive to Augusta, the defendant was asked if he had any cash for bail, whether he had a driver's license, what his name was, what kind of vehicle he was operating, what his father's name was, whether he would take a test, and, finally, whether he was threatening Trooper Roy. He did not respond to the question about a driver's license.

At the correctional facility, the defendant refused an inspection of his mouth prior to beginning the wait period for the intoxilyzer test and stated he would not perform the test. Trooper Roy read the implied consent form. The defendant stated he understood each paragraph but refused the test and did not sign the form.

During his interaction with law enforcement, and particularly Trooper Roy, the defendant's behavior was unfortunate. He was belligerent, aggressive, uncooperative, and was swearing. Many of his statements to law enforcement were obscene and demeaning.

CONCLUSIONS OF LAW

1. Safety Check

Considering all of the circumstances of this case, the execution of the safety check roadblock was reasonable. See State v. Patterson, 582 A.2d 1204, 1205-06 (Me. 1990); 29-A M.R.S. § 1760 (2011); see also State v. Kent, 2011 ME 42, ¶ 11, 15 A.3d 1286 (OUI roadblock) (quoting State v. Cloukey, 486 A.2d 143, 146 (Me. 1985)).

2. Stop

The stop of the defendant's vehicle was justified. See State v. Moulton, 1997 ME 228, ¶ 9, 704 A.2d 361; see e.g. State v. Pinkham, 565 A.2d 318, 319 (Me. 1989) (reasoning

that "[s]afety reasons alone can be sufficient if they are based upon 'specific and articulable facts.'").

### 3. Field Sobriety Tests

Trooper Roy was warranted in administering the field sobriety tests. See State v. Wood, 662 A.2d 919, 920 (Me. 1995) (quoting State v. Dulac, 600 A.2d 1121, 1122 (Me. 1992)); State v. Little, 468 A.2d 615, 617–18 (Me. 1983).

### 4. Arrest

There was sufficient probable cause to arrest the defendant. See State v. Webster, 2000 ME 115, ¶ 7, 754 A.2d 976.

### 5. Statements

The officers asked administrative questions before the defendant's arrest. An "ordinary traffic stop to ask a few questions and to conduct field sobriety tests on a driver suspected of operating under the influence does not amount to custodial interrogation" that requires Miranda warnings. See State v. Lewry, 550 A.2d 64, 65 (Me. 1988). The questions asked after the arrest were administrative, except for the questions about whether the defendant had a driver's license, what kind of vehicle the defendant was operating, and whether the defendant was threatening Trooper Roy. See State v. Rossignol, 627 A.2d 524, 526 (Me. 1993).

### 6. Voluntariness

The defendant's statements were voluntary. See State v. Cole, 1997 ME 112, ¶ 6, 695 A.2d 1180; State v. Mikulewicz, 462 A.2d 497, 500-01 (Me. 1983).

The entry is

> The Motion to Suppress is GRANTED with regard to the defendant's responses to Trooper Roy's questions about what kind of car the defendant was operating and whether

6

the defendant was threatening Trooper Roy. Those responses are SUPPRESSED.

The remainder of the Motion to Suppress is DENIED.

Date: September 24, 2012

Nancy Mills
Justice, Superior Court

KENN-CR-11-835