2008 ME 54

**In re NATASHA S.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Dec. 20, 2007.

Decided: March 20, 2008.

James M. Dunleavy, Esq., Dunleavy Law Offices, Presque Isle, ME, for the mother.

G. Steven Rowe, Attorney General, Janice Stuver, Assist. Atty. Gen., for the Department of Health and Human Services.

Richard Dubois, Esq., Caribou, ME, for Guardian Ad Litem.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: CLIFFORD, LEVY, SILVER, MEAD, and GORMAN, JJ.

Dissent: SAUFLEY, C.J. and ALEXANDER, J.

SILVER, J.

[¶ 1] The adoptive mother of Natasha S. appeals from a judgment entered by the District Court (Fort Kent, *Daigle, J.*) terminating her parental rights pursuant to 22 M.R.S. § 4055 (2007). The adoptive mother contends that the court erred in admitting the Interstate Compact on Placement of Children (ICPC) home study for purposes other than showing compliance with the ICPC. We agree that the court erred in admitting the ICPC study for purposes beyond those permitted by statute, and we therefore must vacate the court's judgment and remand for further proceedings.[1]

## I. BACKGROUND

[¶ 2] Janice S. is the maternal grandmother and adoptive mother of Natasha and lives in Boston, Massachusetts. Natasha is a ten-year-old girl with multiple mental health diagnoses, including post-traumatic stress disorder, oppositional defiant disorder, reactive attachment disorder, and attention deficit hyperactivity disorder, combined type. Natasha's biological mother had serious, untreated substance abuse issues, and Janice adopted Natasha in September 2000 after her biological mother's parental rights were terminated.

[¶ 3] In October 2002, Janice brought Natasha to an emergency services team for a medical evaluation because of Natasha's disturbing behaviors. Natasha had reportedly exhibited cruel behavior toward animals and had also been smearing feces, eating food from the trash bin, stealing

1. None of the mother's other arguments merit our discussion.

other children's lunches in school, and hoarding food in her room. Natasha's deteriorating behaviors prompted Janice to send Natasha to live in Maine with her biological mother. Janice made this decision because she believed the biological mother was no longer abusing substances so she felt that the biological mother deserved a chance to take care of and raise Natasha.

[¶ 4] The biological mother brought Natasha to a child psychiatric unit at Northern Maine Medical Center in August 2004, after she found Natasha trying to hang a kitten. In the process of examining Natasha, the medical staff discovered significant bruising on Natasha. Natasha said her biological mother caused the bruising by hitting her with a belt.

[¶ 5] In November 2004, the District Court found that Natasha would be in circumstances of jeopardy if left in Janice's care. By agreement of the parties, jeopardy was adjudicated as "threat of failure to protect, due to allowing her child to return to her biological mother's care where the child was subsequently physically abused." The Maine Department of Health and Human Services assumed custody of Natasha. For the purposes of reunification, the court ordered Janice to "participate in counseling with Natasha, sign all releases, and participate in visitation with her daughter up to twice a month."

[¶ 6] During the next two years, four uncontested judicial review hearings were held. In all four review orders, the court reaffirmed the placement of Natasha in the Department's custody and found that the Department had made reasonable efforts to reunify and rehabilitate the family. With regard to Janice's compliance with the case plan, the court found on the first three judicial reviews that her compliance was "good," but on the fourth found that her compliance had been "fair." In the judicial review order generated with the termination order, the court found that her compliance was "unacceptable."

[¶ 7] On May 10, 2006, the Department filed a petition to terminate Janice's parental rights. The Department alleged that Janice had not demonstrated that she had gained the skills necessary to effectively parent Natasha on a daily basis and that she continued to have difficulty understanding the scope of Natasha's disabilities. The Department also alleged that Natasha's significant behavioral and emotional deficits required that she be placed in a permanent and stable living environment where all of her needs could be managed appropriately.

[¶ 8] At the hearing on the termination petition, the Department offered an Interstate Compact on the Placement of Children home study report from the State of Massachusetts as an exhibit.[2] Janice objected to the offer on the ground that, pursuant to 22 M.R.S. § 4007(4) (2006),[3] it

---

2. Based on their conclusions from the home study report, the Massachusetts Department of Social Services did not recommend placement of Natasha with Janice in Massachusetts. The ICPC, on its face, only applies to the interstate placement of children in foster care or possible adoption homes, and does not expressly cover "placement" of children with their parent. 22 M.R.S. § 4007(4)(2006). This section was amended in 2007. *See* P.L.2007, ch. 255, § 4 (effective September 20, 2007). None of the amended

language is relevant to the instant case or changes our analysis.

3. 22 M.R.S. § 4007(4) provides:

**Interstate Compact on Placement of Children.** The provisions of the Interstate Compact on Placement of Children, sections 4191 to 4247, shall apply to proceedings under this chapter. Any report submitted pursuant to the compact shall be admissible in evidence for purposes of indicating compliance with the compact and

was inadmissible for any purpose other than to show compliance with the ICPC. The court admitted the exhibit over Janice's objection.

[¶ 9] Termination of parental rights was not strongly advocated by the guardian ad litem, the social worker, or the therapist. The guardian reluctantly supported the petition for termination:

> This reluctance is due to the affection that Natasha has for Janice ... There is a bond between them. I believe Janice ... has Natasha's best interests at heart and that she believes she can manage Natasha's needs as well as her own. History, and the ongoing needs of Natasha strongly suggest that she will not be able to do so....

[¶ 10] The social worker observed that Natasha "is developing a more secure attachment with [Janice] and that to interrupt that in a total way would be ... [contrary to her interests]," "that [termination] could be significantly traumatic," and that it would "have greater deleterious effect tha[n][he] may ... even be able to predict." The therapist expressed concern for Janice's ability to independently apply skills of parenting to her home setting if Natasha returned to her custody. Yet, rather than endorsing termination, the therapist encouraged "[a]ppropriate ongoing (preferably wrap-around) service supports," and "at least extended and comprehensively planned home-based services."

[¶ 11] After a one-day hearing, the court entered an order terminating Janice's rights to Natasha. The court found that (1) Janice is unwilling or unable to protect Natasha from jeopardy and the circumstances are unlikely to change within a time frame reasonably calculated to meet Natasha's needs, and (2) termination of Janice's parental rights is in the best interest of Natasha so that she may be made available for adoption and permanency placement.

[¶ 12] Janice filed this timely appeal, challenging the court's admission of the ICPC home study for purposes other than showing compliance with the ICPC.

## II. DISCUSSION

### A. Standard of Review

■ [¶ 13] We have not previously had the opportunity to address the admissibility of a home study report generated pursuant to the ICPC. Whether the substance of the home study report is admissible in evidence pursuant to 22 M.R.S. § 4007(4) is a question of law that we review de novo. *See In re Scott S.*, 2001 ME 114, ¶ 10, 775 A.2d 1144, 1148. "In construing a statute, we first look to the plain meaning of the statutory language to give effect to legislative intent; only if the meaning of the statute is unclear will we examine other indicia of legislative intent." *State v. Moulton*, 1997 ME 228, ¶ 14, 704 A.2d 361, 365. The relevant statutory language provides: "a report submitted pursuant to the compact is admissible in evidence for purposes of indicating compliance with the compact *and the court may rely on evidence to the extent of its probative value.*" 22 M.R.S. § 4007(4) (emphasis added.)

[¶ 14] The issue is whether the italicized language provides for the admissibility of evidence contained in the report that goes beyond the issue of compliance with the ICPC. Similar language is found in section 4007(2), which deals with the admissibility of interviews with children and states: "[t]he court may admit and consider oral or written evidence of out-of-court statements made by a child, *and may rely on that evidence to the extent of its proba-*

the court may rely on evidence to the extent of its probative value.

*tive value."* 22 M.R.S. § 4007(2) (2006) (emphasis added). Aided by the word "that," the italicized clause clearly modifies the previous clause and does not confer an independent or separate basis for the admission of evidence beyond what the previous clause allows. Thus, although the clause at issue in the present case lacks the word "that," it seems likely that the Legislature intended for it to have the same effect. However, as written, the meaning of subsection 4007(4) is arguably ambiguous, so we may choose to look at other indicia of legislative intent.

 [¶ 15] The only relevant legislative history is the Statement of Fact that provides: "reports produced as a result of an interstate compact request will be admissible in evidence without testimony from the out-of-state compact administrator for the limited purposes of indicating compliance with the compact." L.D. 21666, Statement of Fact (111th Legis.1984).[4] This statement confirms that, in the absence of testimony from the Massachusetts administrator, the home study report is admissible solely to show compliance with the ICPC. We must therefore conclude that the trial court erred by admitting the report for purposes beyond those related to compliance with the act, and using the report in its determination of parental fitness and best interests of the child.

**B. Harmless Error**

[¶ 16] We must next determine whether the error caused was harmless. *In re Rachel J.*, 2002 ME 148, ¶ 14, 804 A.2d 418, 423. In the context of a termination of parental rights proceeding, we have stated:

[T]he State has the burden of persuading us that it is highly probable that the error did not prejudice the parents or contribute to the result in the case. The State's burden of persuasion is high. *Any doubt will be resolved in favor of the parent.*

Thus, . . . we review the entire record to determine whether the error prejudiced the parents in the presentation of their case or had the potential to affect the outcome of the case. In the absence of substantial certainty, that is, a determination that it is highly probable, that the error had no prejudicial effect and did not affect the outcome, we will vacate the judgment.

*Id.* (quoting *In re Michelle W.*, 2001 ME 123, ¶ 12, 777 A.2d 283, 286) (emphasis added).

 [¶ 17] In *In re Elijah R.*, we found that error was harmless where the court relied on the inadmissible evidence, but the information was duplicated by other sources in the record. 620 A.2d 282, 285–86 (Me.1993). Contrary to the Department's contention that the evidence from the report relied upon by the trial court is cumulative and therefore harmless, there is no evidence in the record to support that view, particularly in light of the standard of proof required by *In re Rachel J.*, 2002 ME 148, ¶ 14, 804 A.2d at 423. The only source of information regarding the social services provided by Massachusetts and Janice's response are from the reports made pursuant to the ICPC. Further, Janice's apparent inability to make appropriate use of the services as proof of her inability or unwillingness to care for Natasha figured prominently in the court's final analysis.

---

4. The bill was enacted as P.L.1983, ch. 772, § 4. A conflicting section 4007(4) was enacted by another chapter law that session. The Legislature corrected the conflict in P.L.1985, ch. 506, Pt. A, § 41.

[¶ 18] In its order, the court made multiple references to the contents of the home study report in its findings of fact:

9. Massachusetts Department of Social Services completed an ICPC home study in January 2006. *The report of that study indicates that Janice ... has made few, if any, changes in her life to evidence her ability to access services in a timely manner for herself, even those services which address basic needs such as health care and fuel assistance.* Said report did not recommend that Natasha be placed with [Janice] in Massachusetts.

10. In addition to making little progress toward the rehabilitation and reunification in this Maine child protection case since August 12, 2004, the date of the Preliminary Protection Order, to August 22, 2006, the date of the hearing on the Petition for Termination of Parental Rights, there was evidence presented that Janice ... received home-based services and individual therapy to assist [Janice] to meet Natasha's needs for a two year period from the Massachusetts Department of Social Services. In spite of services provided to her for a total of a four-year period, jeopardy has not been ameliorated in this case, nor is there any objective indication that jeopardy will be ameliorated in the near future.

. . . .

12. Janice ... has demonstrated her inability to be a consistent nurturing parent for Natasha, or to provide a stable placement for her, with consistent structure, and to provide effective positive discipline for her, or to prevent her from mental health crises.

13. Although Janice ... has been offered and participated in services at least to a certain extent both through the State of Massachusetts Department of Social Services, and the State of Maine Department of Health and Human Services over a four year period, she has not gained the ability to provide for Natasha's needs as her primary caretaker, nor is there any evidence to suggest that she will gain that ability in the foreseeable future.

(Emphasis added.)

[¶ 19] There are several examples in the court's findings where the ICPC findings were intertwined with other evidence in the record. The court did not hear any testimony from any therapist, social worker, or other individual who had visited the mother's home or evaluated her in Boston. Instead, the court appears to have relied on the ICPC home study report, which included records from The House for Little Wanderers, a social services organization in Roslindale, Massachusetts that provided in-home supports to Janice, to make findings about Janice's home and ability to parent Natasha.

[¶ 20] Pamela Dubois, the Maine DHHS worker, testified that her concerns about Janice's ability to parent Natasha were based on the ICPC study. She testified that "Janice struggled with disorganization. She had lost her Massachusetts health benefits because she kept her bills in a box. She hadn't opened them. She had not applied for heating assistance—for last winter. She had no source of income. She had not followed up on her disability claim." The exact language regarding these concerns in the ICPC report is as follows:

On 6/27/2003, Janice obtained an application for Social Security Disability Insurance. She claimed to have completed the application, but as of this writing, she is not receiving that support. Janice said that her application was denied. However, she has not followed through with the appeals process to date. . . .

Again, her inability to either find or complete paperwork has led to her insurance (Mass Health) being shut off. As of 12/2005 she had not yet applied for Fuel Assistance. . . . Janice has a box of bills in her bedroom that she has been unable to pay.

Dubois did not provide a basis for this portion of her testimony other than the ICPC report. No other witnesses testified to Janice's ability to access these specific services.

[¶ 21] Despite Janice's testimony that she currently does have health insurance from the state of Massachusetts, Dubois testified that she had no knowledge of Janice's health insurance status and had not asked about it recently, even though seven months had passed since Massachusetts conducted its assessment. Janice testified that she has a claim pending for Social Security Supplemental Security Income and has secured the services of an attorney to pursue the appeal. She also testified that she is now enrolled in the state's heating assistance program for the upcoming winter. The court, however, did not mention any of Janice's progress in meeting her own needs in its findings, which appear to have been based largely on the ICPC report, that she was unable to "access services in a timely manner."

[¶ 22] Finally, the court's finding about Janice's inability to be a "nurturing" parent appears to have no basis in the record other than the following language in the ICPC report:

... Janice is not very affectionate towards Natasha. . . . Natasha has always tried to express affection to Janice. During these encounters, Janice would sometimes lean away from Natasha or ask her to stop hugging her, etc. Whether or not it is still the case, when this family was involved with DSS, Natasha was a child that needed affection

in some form. Natasha's therapist and this worker were sometimes concerned that Janice was unable to satisfy this need of Natasha's. . . .

In direct contrast, Dubois testified that she had the opportunity to observe interactions between Janice and Natasha and described them as "very appropriate. They're very loving towards one another." Natasha's social worker testified similarly: "I believe there has been enough sign of *nurturance* and affection between [Janice] and [Natasha] that if she were to feel that she lost contact indefinitely with her, that, yes, that would be traumatic." (Emphasis added.) Not one witness testified that Janice failed to meet Natasha's needs for affection. This finding therefore appears to be based primarily, if not solely, on the ICPC report. Such a negative characterization of Janice, moreover, is highly prejudicial and therefore not harmless.

■ [¶ 23] Because the court relied upon and accorded substantial weight to the information contained in the home study report for its findings and conclusions of law, there can be no substantial certainty that the error did not have prejudicial effect and that it did not affect the outcome. Evaluating the extent of the harm is merely speculative and we are therefore bound to resolve this doubt in favor of the mother. *In re Rachel J.*, 2002 ME 148, ¶ 14, 804 A.2d at 423. Accordingly, we conclude that the error was not harmless and vacate the judgment of the trial court. In making this decision we do not intend, as the dissent argues, to offer any view or suggestion of the extent to which witnesses offering opinions may rely on otherwise inadmissible evidence to support their opinion.

[¶ 24] We acknowledge that there may be sufficient evidence in the record, absent the ICPC report, for the trial court to make the findings required to support an

order of termination of Janice's parental rights. We therefore remand and direct the trial court to act within its discretion to either: (1) consider the record without the ICPC findings, or additional testimony, within 30 days; or, (2) hold a new hearing within 30 days if it deems additional testimony to be necessary, without admitting the ICPC findings; and issue a new ruling.

The entry is:

Judgment vacated and remanded to the District Court for further proceedings consistent with this opinion.

ALEXANDER, J., with whom SAUFLEY, C.J. joins, dissenting.

[¶ 25] I respectfully dissent. I concur that the District Court erred in admitting and considering the Massachusetts ICPC report for substantive purposes. However, the information in the ICPC report was dated and its relevant content was duplicated by the much higher quality evidence of more recent events that the court heard from DHHS workers, social workers, a therapist, the guardian ad litem, and, most significantly, Janice herself. That higher quality and more recent evidence fully supports the District Court's findings that Janice is not now and will not be capable of parenting and caring for Natasha or protecting her from jeopardy within a time reasonably calculated to meet the child's needs. *See* 22 M.R.S. § 4055(1)(B)(2)(b). Accordingly, the error in considering the ICPC report is harmless.

[¶ 26] Let us look at the substantial volume of evidence in the record that is separate from the ICPC report and supports the District Court's parental unfitness finding. That evidence demonstrates that Janice S. is the maternal grandmother of Natasha S. She lives in Boston, Massachusetts. Natasha is a ten-year-old girl with multiple mental health diagnoses, although, with support from her current foster home, she functions sufficiently well to participate in regular classes, rather than separate special education classes, at her school.

[¶ 27] Natasha's biological mother has serious issues relating to substance abuse and physical abuse of children. After the Massachusetts Department of Social Services (DSS) intervened and took custody of Natasha, Janice first became a foster parent and then adopted Natasha in September 2000, after the biological mother's parental rights were terminated. DSS remained involved with Janice and Natasha after the adoption.

[¶ 28] Janice's testimony indicated that Natasha had exhibited cruel behavior toward animals, set a fire in her room, smeared feces in the bathroom, chewed on and damaged dolls, stolen food, and engaged in other destructive behavior. For a time, Natasha was out of Janice's care and in a residential treatment program in Massachusetts. Following Natasha's return to Janice from residential treatment, the relationship between Janice and DSS deteriorated. Apparently, many appointments for care and counseling of Janice and Natasha were missed or cancelled. Janice, in testimony, admitted to missing scheduled appointments "once or twice." She blamed most missed appointments on the caregivers. Janice also testified that she disagreed with DSS treatment approaches for Natasha and that Natasha "just seemed to be getting worse."

[¶ 29] The guardian ad litem (GAL), appointed by the District Court, indicated that Janice had terminated therapy through DSS in April 2004, after six months of only "intermittent" participation in scheduled therapy sessions. The GAL also indicated that by 2004 "Janice was having almost no success in helping Natasha deal with her behaviors."

[¶ 30] In May 2004, Natasha's behavior and Janice's deteriorating relationship with DSS caused Janice to send Natasha to live in Maine with her abusive biological mother. Janice testified that she made this decision because she believed the biological mother was no longer abusing substances and deserved a chance to take care of and raise Natasha.

[¶ 31] Two months after Janice sent Natasha to Maine, the biological mother brought Natasha to the child psychiatric unit at Northern Maine Medical Center where she was admitted for disruptive behaviors after diagnosis of several significant mental conditions. In the process of examining Natasha, the medical staff discovered significant bruising on Natasha. Natasha said her biological mother caused the bruising by hitting her with a belt. Upon the hospital report, the Maine Department of Health and Human Services (the Department) took temporary custody of Natasha.

[¶ 32] In November 2004, custody of Natasha was awarded to the Department by an agreed jeopardy order. Jeopardy was adjudicated as "threat of failure to protect, due to allowing her child to return to her biological mother's care where the child was subsequently physically abused." For the purposes of reunification, the court ordered Janice to "participate in counseling with Natasha, sign all releases, and participate in visitation with her daughter up to twice a month."

[¶ 33] During the next two years, four uncontested judicial review hearings were held. In all four review orders, the court reaffirmed the placement of Natasha in the Department's custody and found that the Department had made reasonable efforts to reunify and rehabilitate the family. With regard to Janice's compliance with the case plan, the court found in the first three judicial reviews that her compliance was "good," but in the fourth found that her compliance had been "fair." In the judicial review order generated at the same time as the termination order, the court found that her compliance was "unacceptable." This occurred because of Janice's declining number of visits with Natasha, which, as with the missed counseling sessions in Massachusetts, Janice blamed primarily on others.

[¶ 34] On May 10, 2006, the Department filed a petition to terminate Janice's parental rights. The Department alleged that Janice had not demonstrated that she had gained the skills necessary to effectively parent Natasha on a daily basis and that she continued to have difficulty understanding the scope of Natasha's disabilities. The Department also alleged that Natasha's significant behavioral and emotional deficits required that she be placed in a permanent and stable living environment where all of her needs could be managed appropriately.

[¶ 35] At the hearing on August 22, 2006, the trial court properly admitted and considered evidence from the court-appointed GAL, the therapist in Maine who had worked with both Janice and Natasha, Natasha's prior foster mother, her current foster mother, and Janice herself. The Department also offered, over Janice's objection, the ICPC report. Although that report was inadmissible for any purpose other than to show compliance with the ICPC, it is uncontested that the Massachusetts report, demonstrating compliance with the ICPC, stated that DSS would not allow Janice to have custody of Natasha if she were returned to Massachusetts. Janice's objections were not directed to this conclusion, but to the information about Janice and Natasha contained within the report.

[¶ 36] Having available much more current information than was reported in the

ICPC report, the GAL observed that Janice "is barely, if at all, able to manage her own needs. These include, maintaining a household, addressing financial and health care needs." The GAL further reported that Janice is "unable to manage Natasha's needs as well as her own." In response to questions from Janice's counsel asking whether there had been "improvement or deterioration" compared to Janice's circumstances in 2004, the GAL reported, "I am unconvinced as to any improvement on the part of Janice ... to deal with or understand Natasha's needs." Asked about an apparent improvement in Janice's compliance with the case plan since the May 2006 filing of the termination of parental rights petition, the GAL observed that, "[t]his 11th hour participation does not redress the fact that she missed many visits with Natasha as a result of [a trivial argument with the biological mother]."

[¶ 37] The court also heard testimony from the Department social worker, Pamela Dubois, who discussed Janice's poor parenting skills and disorganization and the difficulties these problems would present to properly caring for Natasha. Some of Dubois' testimony was based on direct dealings with and observations of Janice; some of it may have been based on information in the ICPC report. The Court suggests that a witness relying on the ICPC report to arrive at an opinion that the witness testifies about in court was improper and error. Not so. Witnesses who testify to opinions in court regularly rely on reports and other hearsay evidence as part of the process of developing their opinion. Receiving and considering opinions from live witnesses who base their conclusions supporting their opinions, in part, on review of written reports or other inadmissible evidence is not error. M.R. Evid. 703; Field & Murray, *Maine Evidence* § 703.2 at 369–74 (2000 ed.1999).

[¶ 38] The testimony of the GAL and the social worker was supported by Janice's own testimony, which demonstrated similar present and future incapacity to plan for or address her adopted daughter's needs. She blamed most of the problems in her compliance with rehabilitation and reunification programs on others and indicated significant lack of knowledge of timing of the key events in her care for Natasha. For example, she placed the date of her adoption of Natasha nearly two years after 2000 when it had actually occurred, and she denied that DSS, in 2002, had found that she had abused and neglected Natasha, asserting that she had "just received foster care in 2002."

[¶ 39] Janice also testified as to her plans for return of Natasha to her care in Massachusetts, despite knowledge that DSS would prohibit such a return. Although Natasha was in regular school classes in Maine, Janice testified that she would place her in a special needs class in Massachusetts. "When she's in school, its up to the school to protect her, you know, a special needs class." Janice also testified that she might move to Maine at some unspecified point in the future, but only after she had resolved a pending social security claim and cleared up title to the home where she was living. Janice testified that she had learned from her past problems with Natasha and would try to do better, but her statements were short on specific plans for change.

[¶ 40] Evidence was also presented by Janice and Natasha's Maine therapist. While not supportive of termination, he conceded that, despite four years of efforts in education and therapy, Janice "does not demonstrate clear conceptual grasp of goals or facile application of ideas to parenting practice," and that his application of therapy techniques "has not been sufficient for Janice to capably demonstrate

the skills requested of her to assure effectively organized parenting with Natasha. This may relate, as well to other needs she still faces personally." The therapist also reported that, since September of 2005, "I ... have not observed substantial change in her demonstration of skills in dealing with Natasha's needs."

[¶ 41] After the hearing, the court entered an order to terminate Janice's parental rights to Natasha. In its order, the court made the requisite findings on all of the critical issues. Two of its fifteen findings included references to the contents of the ICPC study. Finding number 9 stated:

Massachusetts Department of Social Services completed an ICPC home study in January 2006. The report of that study indicates that Janice ... had made few, if any, changes in her life to evidence her ability to access services in a timely manner for herself, even those services which address basic needs such as health care and fuel assistance. Said report did not recommend that Natasha be placed with [Janice] in Massachusetts.

[¶ 42] This finding reported old information from the ICPC report that was duplicated by the much more recent observations of and evidence provided by the GAL and the therapist, based on their recent experience and ongoing interactions with Janice.

[¶ 43] Finding number 10 reported information on the lack of progress in the Massachusetts therapy programs that was duplicated by Janice's own testimony about her view of the failures in the Massachusetts programs that ultimately led her to return Natasha to her abusive biological mother in Maine. The ICPC material referenced in finding number 10 was

also similar to more recent information reported to the court by the GAL.

[¶ 44] Finding number 13 stated that:

Although Janice ... has been offered and participated in services at least to a certain extent both through the State of Massachusetts Department of Social Services, and the State of Maine Department of Health and Human Services over a four year period, she has not gained the ability to provide for Natasha's needs as her primary caretaker, nor is there any evidence to suggest that she will gain that ability in the foreseeable future.

[¶ 45] While this finding is supported by information in the ICPC study, it is also supported by independent evidence from the GAL and Janice herself. The most critical part of finding number 13, addressing evidence about the time from mid–2004 to the date of the hearing and looking to the foreseeable future, is necessarily based on evidence other than the ICPC study, which primarily referenced information from the past. No other court finding referenced or was reliant on the ICPC study.

[¶ 46] The court terminated parental rights, finding that (1) Janice is unwilling or unable to protect Natasha from jeopardy and the circumstances are unlikely to change within a time frame reasonably calculated to meet Natasha's needs, and (2) termination of Janice's parental rights is in the best interest of Natasha so that she may be made available for adoption and permanency placement. The evidence presented by the witnesses, including Janice, who testified about current events and ongoing observations at the termination hearing, appears to support these findings without much doubt. However, the Court holds that the trial court's reference to the older information in the ICPC report is error that requires reversal. Such can

be the case only if the Court is saying that any error in admission of duplicative evidence in a child protective proceeding cannot be harmless error. The law of harmless error is not so absolute and unyielding.

[¶ 47] In the context of a termination of parental rights proceeding, we have stated that "preserved error is reversible if any substantial right is compromised, to the prejudice of the objecting party, and the supporting party cannot convince the court that the error was harmless in the context of the other events and evidence in the proceeding." *In re Joshua B.*, 2001 ME 115, ¶ 11, 776 A.2d 1240, 1244; *see also In re Rachel J.*, 2002 ME 148, ¶ 14, 804 A.2d 418, 423 ("'[T]he State has the burden of persuading us that it is highly probable that the error did not prejudice the parents or contribute to the result in the case,'" (quoting *In re Michelle W.*, 2001 ME 123, ¶ 12, 777 A.2d 283, 286)).

[¶ 48] In criminal cases, where fundamental rights are also at stake and an enhanced burden of proof applies, we have said that a trial error is harmless when the State demonstrates that it is highly probable that the error did not affect the trial court's decision. *State v. White*, 2002 ME 122, ¶ 16, 804 A.2d 1146, 1150; *see also Williams v. United States*, 503 U.S. 193, 203, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992). Thus, a high probability that an error did not affect the result is the standard we have articulated for harmless error, with the State having the burden to demonstrate the high probability of lack of effect.

[¶ 49] In *In re Elijah R.*, we held that error is harmless when the court references the improperly admitted evidence, but that information is duplicated by other sources in the record. 620 A.2d 282, 285–86 (Me.1993). With this background, let us look at the record here.

[¶ 50] The law provides that parental unfitness to support termination of parental rights exists when the court finds, by clear and convincing evidence, that a parent is unable to take responsibility for a child or protect a child from jeopardy within in a time which is reasonably calculated to meet the child's needs. 22 M.R.S. § 4055(1)(B)(2)(b)(i), (ii).

[¶ 51] The properly admitted evidence supports, without any real dispute, the trial court's conclusions that: (1) Janice is not presently capable of parenting Natasha; (2) Janice takes a passive approach to offered opportunities to improve her parenting skills, sometimes responding, sometimes not, to initiatives offered to her, but not demonstrating significant progress toward improved management of her personal life or her parenting skills; (3) since Janice deemed herself unable to care for Natasha and inappropriately shipped her to Fort Kent to be in her mother's care, her involvement with Natasha has declined despite the Department's initiatives to provide and pay for opportunities for Janice to visit with, and participate in therapy with, Natasha; and (4) beyond present incapacity to care for Natasha, testimony of several witnesses, based on current observations of Janice, supported the view that Janice's situation is not likely to change within the time that is reasonably calculated to meet Natasha's needs.

[¶ 52] The properly admitted evidence supported every one of the trial court's findings. Only findings 9 and 10 were dependent, in part, on information provided in the ICPC report. The information in the ICPC report, based on dated information, was more than replicated by current information, to the same effect, provided by Janice, the witnesses who testified at the court hearing, and the GAL and therapist reports.

[¶ 53] Confronted with this evidence, the trial court was left with no choice on the parental fitness question. The properly admitted evidence provided by the witnesses who testified at the hearing supports, without any real dispute, the court's conclusion that Janice "is unwilling or able to protect Natasha from jeopardy and said circumstances are unlikely to change within a time which is reasonably calculated to meet Natasha's needs." This was the only conclusion to which the information in the ICPC report was marginally relevant. The Massachusetts information was irrelevant to the court's conclusion, also supported by the evidence, that the best interests of Natasha would be served by termination of parental rights.

[¶ 54] In the circumstances, the court's error in admitting and considering the dated and marginally relevant information in the ICPC report was harmless. Although "highly probable" is the standard for our harmless error review, *In re Rachel J.*, 2002 ME 148, ¶ 14, 804 A.2d at 423, here the evidence that was properly admitted demonstrates not only that it is highly probable, but that there is no doubt, that the error in admitting the ICPC report did not contribute to the result reached by the court.

[¶ 55] I would affirm the judgment of the District Court.