**IN THE COURT OF APPEALS OF IOWA**

No. 18-0866
Filed October 10, 2018

**IN THE INTEREST OF J.C.,**
**Minor Child,**

**B.C., Mother,**
        Appellant.
_____


        Appeal from the Iowa District Court for Jefferson County, William S. Owens,

Associate Juvenile Judge.


        A mother challenges the juvenile court's subject matter jurisdiction to

terminate her parental relationship with a son placed with an out-of-state relative.

**AFFIRMED.**



        Larry J. Brock of Brock Law Office, Washington, for appellant mother.

        Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney

General, for appellee State.

        Katie E. M. Lujan of Lloyd, McConnell, Davis & Lujan, LLP, Washington,

guardian ad litem for minor child.



        Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**TABOR, Judge.**

A mother, Bracie, appeals the termination of her parental rights to her son, J.C. She contends the juvenile court lacked subject matter jurisdiction over the termination proceedings under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), enacted as Iowa Code chapter 598B. Bracie does not otherwise dispute the termination order. After our independent evaluation,[1] we conclude the juvenile court retained jurisdiction over the child, placed with relatives in Texas, by virtue of the Iowa Interstate Compact on Placement of Children (ICPC). *See* Iowa Code § 232.158 (2017).

**I.      Facts and Prior Proceedings**

J.C. was born in Iowa in August 2013. The Iowa Department of Human Services (DHS) became involved with the family in June 2014 after receiving reports Bracie cared for J.C. while under the influence of methamphetamine. A month later, the State petitioned to adjudicate J.C. as a child in need of assistance (CINA). The juvenile court set a hearing for October 2014 and placed J.C. in the temporary custody of his maternal great-grandmother, Carol. J.C.'s maternal aunt, Rikki, lived with Carol and helped with J.C.'s care. J.C.'s father, Ashton, lived in Bexar County, Texas, and had not been involved in J.C.'s life. After receiving notice of the CINA proceedings, Ashton took steps to be an active parent and expressed a desire to be a placement option for J.C. Meanwhile, Bracie traveled to Texas and had minimal contact with the caseworkers assigned to the family.

---

[1] We review the evidence on this jurisdictional question de novo. *In re Guardianship of Deal-Burch*, 759 N.W.2d 341, 343 (Iowa Ct. App. 2008).

Following an October 2014 hearing, the juvenile court adjudicated J.C. a CINA under Iowa Code section 232.2(6)(c)(2), (g) and (n) (2014).[2] Bracie appeared through counsel, and Ashton appeared telephonically. The court determined J.C. should remain with Carol, but directed the DHS to conduct paternity testing to open the possibility of placing J.C. in Ashton's care. The court set a disposition hearing for November 2014. Before the November hearing, the DHS learned Carol planned to leave town for several months in early 2015. Rikki intervened, and the court granted her temporary custody of J.C.

J.C. remained in Rikki's care until April 2015, when the DHS learned Rikki was involved in the use and distribution of marijuana from the apartment where she and J.C. were living. The juvenile court returned J.C. to the custody of DHS so it could place him in foster care. The next month, the Texas Department of Family and Protective Services (DFPS) completed and approved the home study requested by the Iowa DHS under the ICPC so J.C. could be placed in Ashton's care in Texas. The juvenile court placed J.C. with Ashton in Texas and ordered

---

[2] Iowa Code section 232.2(6) provides:
> "Child in need of assistance" means an unmarried child:
> > c. Who has suffered or is imminently likely to suffer harmful effects as a result of any of the following:
> > . . . .
> > (2) the failure of the child's The failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child.
> > . . . .
> > g. Whose parent, guardian, or custodian fails to exercise a minimal. Degree of care in supplying the child with adequate food, clothing, or shelter and refuses other means made available to provide such essentials.
> > . . . .
> > n. Whose parent's or guardian's mental capacity or condition, imprisonment, or drug or alcohol abuse results in the child not receiving adequate care.

the Iowa DHS to monitor the placement through the ICPC in coordination with the Texas DFPS.

In the interim, the DHS repeatedly tried to reach Bracie and provide her services but was unsuccessful. At a December 2015 permanency hearing, both the DHS and J.C.'s guardian ad litem (GAL) expressed satisfaction with Ashton's care for J.C. in Texas. The juvenile court continued the placement. But the juvenile court also granted "[t]he [d]istrict [c]ourt in Iowa, or its equivalent in the [s]tate of Texas . . . concurrent jurisdiction to enter appropriate custodial orders on behalf of the child" per the DHS's request. The Texas court took no action.

J.C. remained with his father until June 2016, when Texas authorities revoked Ashton's probation and sentenced him to eighteen months in prison. Ashton entrusted J.C.'s care to the child's aunt, Ashley, who also resided in Texas. The Texas DFPS completed an expedited request by the Iowa DHS for a home study. And in August 2016, the juvenile court granted Ashley's temporary custody of J.C.

In late 2016 Ashley expressed a desire to become J.C.'s permanent caretaker. The DHS and GAL believed Ashley was diligent in meeting J.C.'s needs. Given the successful placement, the juvenile court modified the permanency goal as "guardianship to a relative." The juvenile court further directed Ashley to seek a custodial order in the Texas courts.[3] The juvenile court

---

[3] In its December order maintaining placement of J.C. with Ashley, the juvenile court inadvertently stated, "Father shall pursue a custodial order in the State of Texas." It repeated this error in its March 2017 permanency order. Upon the State's request, the court corrected the March order to instead read: "Custodian shall pursue a guardianship or its equivalent order in the State of Texas." But it does not appear the court corrected its December 2016 order.

reaffirmed these findings after a March 2017 permanency hearing. At this point, the DHS did not believe termination of Bracie's rights was necessary.

In May 2017, Ashley filed a petition in Bexar County, Texas, requesting the district court appoint her as J.C.'s "sole managing conservator."[4] In July 2017, J.C.'s maternal grandmother, Debra, moved to intervene in the Bexar County proceedings, asking the court to appoint her as a "non-parent possessory conservator" of J.C., "since the mother's supervised access and possession can occur during the same time of [Debra's] access and possession."

In November 2017, Bracie moved to transfer and consolidate the Iowa CINA proceeding with the Bexar County, Texas matter. The next day, the State of Iowa filed its petition to terminate Bracie's parental rights. The Iowa DHS recommended termination of Bracie's parental rights at this time believing Debra would lack standing to intervene in the Texas suit if deprived of her status as J.C.'s grandmother, allowing Ashley to proceed with the guardianship matter uncontested.

The juvenile court set the termination hearing for January 3, 2018. But on January 2, Bracie moved to dismiss for lack of subject matter jurisdiction, delaying the proceedings. The juvenile court, after briefing and arguments, denied both the motion to consolidate and transfer and the motion to dismiss, and reset the termination hearing for April 2018.[5]

---

[4] A Texas "conservator" is analogous to an Iowa "guardian." *Compare* Texas Code § 53.371, *with* Iowa Code § 232.2(21)(a)–(b).

[5] Meanwhile, in January 2018, Debra filed a motion in Bexar County to establish Texas as the child's home state. Later that month, Ashley moved to dismiss the Bexar County, Texas proceeding, reportedly because she lacked the funds necessary for costs associated with the trial. The Bexar County court dismissed the suit.

At the April 2018 hearing, the caseworker testified the DHS recommended termination so Ashley could adopt J.C.[6] Bracie last saw J.C. in December 2014. The juvenile court recognized Bracie's recent progress in her rehabilitation, employment, and housing, but ultimately determined J.C.'s best interests were served by being in Ashley's permanent care. Bracie appeals the juvenile court's order terminating her parental rights.

## II. Analysis

The mother asserts on appeal that the juvenile court erred in finding it had subject matter jurisdiction over the termination-of-parental-rights proceedings. She argues Iowa was not J.C.'s "home state" on November 29, 2017, when the State filed its petition to terminate her parental rights. Alternatively, the mother contends the juvenile court should have declined to exercise jurisdiction because J.C.'s prolonged absence from Iowa and the corresponding lack of evidence remaining here make Iowa an inconvenient forum. *See* Iowa Code § 598B.207. The State counters that the ICPC allows the Iowa juvenile court to retain jurisdiction as the "sending agency." The State does not address Bracie's inconvenient forum argument.

The Iowa legislature enacted the UCCJEA to resolve jurisdictional issues and promote cooperation between courts of sister states in determining child custody and guardianship matters. 2 Marlin M. Volz Jr., *Iowa Practice Series: Methods of Practice* § 31:27, at 874 (Aug. 2018 ed.); *see also In re Jorgensen*, 627 N.W.2d 550, 555–56 (Iowa 2001) ("The UCCJEA provides the 'exclusive

---

[6] But, as the juvenile court pointed out, J.C's father Ashton's parental rights would also have to be terminated before Ashley could adopt J.C.

jurisdictional basis for making a child custody determination by this state.'"); *In re Marriage of El Krim & Amin*, No. 16-1620, 2017 WL 2465806, at 6* (Iowa Ct. App. June 7, 2017) (quoting *Deal-Burch*, 759 N.W.2d at 343–44). Section 598B.201(1)–(3) provides:

> 1. Except as otherwise provided in section 598B.204, a court of this state has jurisdiction to make an initial child-custody determination only if any of the following applies:
> a. This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.
> b. A court of another state does not have jurisdiction under paragraph "a", or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under section 598B.207 or 598B.208 and both of the following apply:
> (1) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.
> (2) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.
> c. All courts having jurisdiction under paragraph "a" or "b" have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under section 598B.207 or 598B.208.
> 2. No court of any other state would have jurisdiction under the criteria specified in paragraph "a", "b", or "c".
> 3. Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child-custody determination.

"Child-custody proceedings" as defined by the statute encompass, among other matters, neglect, abuse, dependency, guardianship, and termination-of-parental-rights proceedings. Iowa Code § 598B.102(4). "Home state" is defined as "the state in which a child lived with a parent or person acting as a parent for at least six consecutive months immediately before the commencement of the child-custody proceeding."

The record supports the conclusion, and Bracie does not contend otherwise, that Iowa was J.C.'s "home state" at the time of the initial child-custody determination—when the State filed the CINA petition in 2014. But Bracie maintains the current proceeding "commenced" in November 2017 when the State filed its termination petition. She argues because J.C. had been residing in Texas for more than two years at that time, Texas was J.C.'s home state, thus the Iowa juvenile court lacked subject matter jurisdiction under the UCCJEA. In support of her assertion the termination petition date—rather than the CINA petition date—is the time for determining jurisdiction, Bracie cites *In re N.H.*, No. 11-1823, 2012 WL 298899, at *1 (Iowa Ct. App. Feb. 1, 2012) and *In re S.W.*, No. 11-0710, 2011 WL 3115841, at *1 (Iowa Ct. App. July 27, 2011).

In both *N.H.* and *S.W.*, we determined the Iowa juvenile court properly exercised subject matter jurisdiction. *N.H.*, 2012 WL 298899, at *1; *S.W.*, 2011 WL 3115841, at *1. We premised those determinations on our conclusion that the proper measure of a child's "home state" for jurisdictional purposes was the date of filing the termination petition rather than the CINA petition because those proceedings are distinct. *See N.H.*, 2012 WL 298899, at *1, 3–4 (finding Iowa the children's home state when, at the time the CINA petition was filed, the child's home state was Illinois but Illinois declined to exercise jurisdiction, and the children remained in Iowa foster care placement until filing of termination petition one year later); *S.W.*, 2011 WL 3115841, at *1, 3–4 (finding Iowa the child's home state because the child lived in Iowa for more than six months preceding filing of termination petition, despite the State's previous filing of a CINA petition when the child's whereabouts were unknown at the time). But in neither case did we confront

whether the existence of an ICPC order impacted the juvenile court's ongoing jurisdiction between the CINA and termination filings. Accordingly, *N.H.* and *S.W.* are not controlling.

Here, the juvenile court placed J.C. with relatives in Texas under the ICPC. The ICPC "provides a legal and administrative mechanism allowing the placement of a child outside the jurisdictional boundaries of the state invoking the Compact." Thomas A. Jacobs, 1 *Children & the Law: Rights and Obligation*s § 2:84 (2018). It ensures children receive the "necessary and desirable degree and type of care" by facilitating collaboration between inter-state agencies—the "receiving state" monitors the placement on behalf of the "sending state," allowing the "sending state" to verify and review the placement. *Id.* The ICPC also provides a "method for determining legal, fiscal, and jurisdictional responsibilities" for children placed out of state. *Id.* (citing *In re Natasha S.*, 943 A.2d 602 (Me. 2008)).

Important to the question before us, the ICPC states: "The sending agency[7] shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have had if the child had remained in the sending agency's state . . . ." Iowa Code § 232.158(5)(a). When the juvenile court places a child with out-of-state relatives under the ICPC, the ICPC provides the sending agency retains jurisdiction as "if the child had remained in the sending agency's state." *Id.* § 232.158(5)(a). The ICPC provides four bases on which the sending agency may relinquish jurisdiction: (1) the child is adopted; (2) the child reaches majority; (3)

---

[7] Here, the "sending agency" was the Iowa juvenile court. Iowa Code § 232.158(2)(b) (defining "sending agency" to include "a court of a party state").

the child becomes self-supporting; or (4) the child is "discharged with the concurrence of the appropriate authority in the receiving state." *Id.* None of those triggering events occurred here. Because Iowa was J.C.'s home state when the State filed its initial CINA petition, and because the juvenile court placed him with Texas relatives under the ICPC, Iowa remains his home state until an event triggering relinquishment of jurisdiction under the ICPC.[8] *See In re R.S.*, No. 15-1112, 2015 WL 5577597, at *3–4 (Iowa Ct. App. Sept. 23, 2015); *see also E.H. v. Dep't of Health & Soc. Servs.*, 23 P.3d 1186, 1190–92 (Alaska 2001) (describing children as retaining "constructive Alaska residency for jurisdictional purposes" through interstate compact); *In re A.R.B.*, 312 P.3d 425, 427–28 (Mont. 2013).

The mother next argues the juvenile court should have declined to exercise its jurisdiction because Iowa is now an inconvenient forum under Iowa Code § 598B.207. She bases this contention on the fact that J.C., his father, and his maternal aunt all reside in Texas, "all the most recent information about [J.C.] is in Texas and none is in Iowa. All material witnesses, other than the [m]other, who

---

[8] To the extent the mother argues the juvenile court's grant of "concurrent jurisdiction" constitutes a "discharge" of its jurisdiction under the ICPC or a declination to exercise jurisdiction under the UCCJEA, we disagree. Without deciding whether the juvenile court's purported grant of concurrent jurisdiction to the Texas district court was proper, we do not believe the juvenile court's order was sufficiently specific to relinquish its jurisdiction. *See A.B. v. M.B.*, 569 N.W.2d 103, 106 (Iowa 1997) ("Nor is jurisdiction conferred by [Iowa Code § 598A.3(1)(d) (1995), *repealed by* Iowa Code § 598B.201(1)(d) (1999)] on the basis that the juvenile court's order authorizing concurrent jurisdiction amounted to a declination of jurisdiction in favor of the Texas forum. Assuming without deciding that a juvenile court in the home state is empowered to bypass the general jurisdiction courts of that state in favor of an out-of-state forum based on the considerations enumerated in [Iowa Code § 598A.3(1)(d) (1995), *repealed by* Iowa Code § 598B.201(1)(d) (1999)], the juvenile court did not do so in the present case. . . . . The mother contends that only an Iowa court may be granted concurrent jurisdiction of custody issues under section 232.3 by an Iowa juvenile court. Although we find that too restrictive, the present case vividly illustrates the practical concerns that can arise from permitting such adjudications by the courts of other states while a CINA proceeding is pending in Iowa.").

can testify regarding the welfare of the child are in Bexar County, Texas . . . ." Section 598B.207(1) lays out relevant factors for a court to consider in determining whether it is an inconvenient forum: (1) the occurrence or likelihood of domestic violence; (2) length of time the child has lived out of state; (3) distance between Iowa and alleged more convenient forum; (4) parties' financial circumstances; (5) prior agreements between the parties regarding jurisdiction; (6) judicial efficiency of proceeding in either state; (7) the familiarity of the court of each state with the facts and issues involved in the proceeding. This discretionary provision "allows a court to decline jurisdiction upon motion by a party if it is an inconvenient forum under the applicable circumstances." *A.R.B.*, 312 P.3d at 278–79 (interpreting uniform act). Bracie correctly points out J.C. has resided with his caretakers in Texas since 2015. But the Iowa DHS has been closely monitoring those placements throughout the child-welfare case. And Bracie remains in Iowa, along with the bulk of the evidence relevant to terminating her parental rights— information about her relationship with her son and whether she can adequately care for him. For these reasons, we agree with the juvenile court's determination Iowa was a convenient forum for the termination proceeding.

**AFFIRMED.**